IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| WESTLAKE OIG, LLC., <br><br> Plaintiff, <br><br> v. <br><br> FRANK L. PARKER JR., FRANK L. PARKER JR. LLC., PLAST LLC (an Alabama Limited Liability Company), PLAST LLC (a District of Columbia Limited Liability Company), LYDIA LaFLEUR, ROOSEVELT (TREY) DANIELS III, CLIFFORD R. SHOWS, ROBERT C. ARLEDGE and RANDALL G. WELLS, <br><br> Defendants. | Civil Action No. _____ <br><br> **JURY TRIAL REQUESTED** |

---

## PLAINTIFF'S ORIGINAL COMPLAINT

---

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

Plaintiff Westlake OIG, LLC ("Westlake"), files this its Original Complaint complaining of and against Defendants Frank L. Parker, Jr. ("Parker"), Frank L. Parker Jr., LLC ("Parker LLC"), Plast, LLC (an Alabama Limited Liability Company) ("Alabama Plast"), Plast, LLC (a District of Columbia Limited Liability Company) ("DC Plast'), Lydia LaFleur ("LaFleur"), Roosevelt (Trey) Daniels III ("Daniels"), Clifford R (Ronnie) Shows ("Shows"), Robert C. Arledge ("Arledge") and Randall G. Wells ("Wells"), and, in support thereof, would respectfully show the Court as follows:

# I.
## <u>THE PARTIES</u>

1.      Plaintiff Westlake OIG, LLC. is a limited liability company organized and existing under the laws of the State of Nevada.

2.      Defendant Frank L. Parker, Jr. is an individual resident of the State of Alabama and may be served with process at his residence located at 4105 Ridge Lawn Drive Mobile, Alabama.

3.      Defendant Frank L. Parker, LLC. is a limited liability company organized and existing under the laws of the State of Alabama, with its registered office located in Mobile, Alabama, and may be served with process by serving its member Frank L. Parker, Jr. at 4105 Ridge Lawn Drive, Mobile, Alabama.

4.      Defendant Plast, LLC. (an Alabama Limited Liability Company) is a limited liability company ***organized and existing under the laws of the State of Alabama*** since February 26, 2018, and may be served with process by serving its registered agent Michael A. Wing at 401 Church Street, Mobile, Alabama 36602.

5.      Defendant Plast, LLC. (a District of Columbia Limited Liability Company) is a limited liability company ***organized and existing under the laws of the District of Columbia*** since March 2, 2020, and may be served with process by serving its registered agent Randall G. Wells, at 110 Maryland Avenue, NE, Suite 510, Washington D.C. 20002.[1]

---

[1] As discussed in detail below, the DC Plast was formed as part of Defendants' ongoing fraudulent scheme to defraud Plaintiff and to engage in the illegal sharing of attorneys' fees with non-attorneys.

6.     Defendant Lydia LaFleur is an individual resident of Louisiana and may be served with process at her residence located at 6298 Sevenoaks Avenue, Baton Rouge, LA 70806.

7.     Defendant Roosevelt (Trey) Daniels III, is an individual resident of Houston, Harris County, Texas and may be served with process at his residence located at 2380 S. MacGregor Way, Apartment 111, Houston, Texas 77021.

8.     Defendant Clifford R. (Ronnie) Shows is an individual resident of Mississippi and may be served with process at 20 Golf Club Road, Hattiesburg, Mississippi 29402.

9.     Defendant Randall G. Wells is an individual resident of the State of Louisiana and may be served with process at 6541 Sheffield Avenue, Baton Rouge, Louisiana 70806.[2]

## II.
## JURISDICTION & VENUE

10.     Jurisdiction is proper in this Court on the basis of federal question in accordance with 28 U.S.C. § 1331 and 18 U.S.C. § 1964.

11.     Venue is proper in the Southern District of Texas, Houston Division, in accordance with 18 U.S.C. § 1965(a) as Defendant Daniels resides, is found and transacts his affairs in the Southern District of Texas and against the remaining

---

Defendant Wells, the listed ***agent*** for DC Plast, is an attorney licensed to practice law in Washington D.C. and Louisiana, but resides in Louisiana and is not believed to be present at the DC Plast listed registered agent address.  In any event, Defendant Wells is not a member of DC Plast or of Alabama Plast and is not a party to any fee sharing agreement with either Plast entity.
[2] The Defendants, with the exception of Defendant Wells, shall hereinafter be collectively referred to as the "Plast Defendants."

Defendants under 18 U.S.C. § 1965(b) because the ends of justice require that the other Defendants residing in other districts be brought before this Court.

### III.
### FACTUAL BACKGROUND

### The Underlying Investment

12.     Defendant Parker is an attorney licensed to practice law in the States of Alabama, Florida and Mississippi.   Defendant Parker is the sole attorney and member of Defendant Parker LLC.

13.     Defendants Parker and Parker LLC represent that they are retained counsel and/or co-counsel of many Plaintiffs with claims allegedly totaling billions of dollars in the massive opioid litigation (the "Opioid Litigation").  Defendants Parker and Parker LLC further represent that their share of the fees payable in the Opioid Litigation totals in the hundreds of millions of dollars, if not more.

### The Solicitation

### The Introduction of the Investment

14.     In or about February 2018, Defendants Parker, Arledge, Shows, Lafleur and Daniels formed Alabama Plast.  Article 1.05 of the Alabama Plast's Operating Agreement defines the purpose of, and compensation to be paid to, Alabama Plast as follows:

> The LLC and/or its members shall use its resources to identify potential claimants in the Opioid litigation which will be referred to various law firms pursuant to a co-counsel agreement between the firms and Frank Parker Law; any moneys recovered by any member of the LLC shall be deposited into the LLC's account and distributed to deposited into the

---

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                    **PAGE 4**

LLC's account and distributed to the members to their respective ownership interest in the LLC described herein.

15.     With the exception of Parker, none of the other members of Alabama Plast are licensed attorneys.

16.     In or about August 2018, Defendant Parker, was fishing with Keith Chunn ("Chunn"), one of Plaintiff Westlake's members.  Parker had an existing relationship with Chunn and was aware that Chunn had access to investment money from various sources (the "August Fishing Trip").

17.     During the August Fishing Trip, Parker represented to Chunn that Parker had been retained as co-counsel to represent numerous municipalities in the Opioid Litigation.  Parker further represented to Chunn that the municipality plaintiffs in the Opioid Litigation (the "Municipality Plaintiffs") had the most valuable claims in the litigation, and that Parker, through such representation, was to receive at least hundreds of millions of dollars in attorneys' fees upon the settlement of the claims.

18.     Parker further represented to Chunn that Parker and others had formed a limited liability company -- Alabama Plast -- whose purpose was to recruit and refer clients to Parker and the various firms that he had co-counsel arrangement with.  In exchange for their client recruitment and referral services, Parker and Parker LLC agreed to pay Alabama Plast 100% of all attorneys' fees payable to Parker and Parker LLC from the Opioid Litigation, net of certain hard operating expenses.

19.     According to Parker, Alabama Plast needed additional capital to continue its recruiting and referral activities.  To obtain the capital, the members of Plast had unanimously voted and passed a resolution in June 2018 to seek an investor and offer to sell the investor a 1/6 interest in Alabama Plast, in exchange for a $6.5 million investment in the entity.[3]  Parker further represented that Plast already had an interest worth over $1 billion in fees, and, consequently, the investment was already assured of being extremely profitable; even if no new plaintiffs were recruited or referred.

20.     Based upon Parker's representations, Chunn requested that Parker send offering materials and backup information regarding the opportunity for review and advised Parker that he would introduce the Plast Defendants to potential investors.  At the conclusion of the August Fishing Trip, Parker agreed to pay Chunn a 10% fee for any monies raised.

## The Interstate Distribution of Offering Materials

21.     Subsequent to the August Fishing Trip, on August 12, 2018, August 13, 2018, and October 13, 2018, the Plast Defendants delivered, in interstate commerce via emails, offering memorandums detailing, among other things, the investment opportunity, the plaintiffs purportedly already retained, and the value of Alabama

---

[3] On June 1, 2018, two months before the August Fishing Trip, the members of Alabama Plast unanimously consented, by a written resolution, to offer to sell a 1/6 membership interest in Alabama Plast for the sum of $6.5 million (the "Alabama Plast Offering Resolution").  A true and correct copy of the Alabama Plast Offering Resolution is attached hereto as Exhibit A.

Plast's interest (hereinafter collectively referred to as the "Offering Materials"), true and correct copies of which are attached hereto as Exhibit B.

22.     Throughout the Offering Materials, The Plast Defendants made numerous material representations regarding, among other things, the identity of "existing clients," the value of the claims, and Alabama Plast's interest in the claims (the "Offering Materials Representations").

23.     Among the Offering Materials Representations were representations that Alabama Plast had an existing interest in claims owned by at least 16 municipalities, including the City of Houston, with Alabama Plast's interest totaling $1,047,325,640.31(the "Municipality Representations").

## The Investor Meeting

24.     On November 19, 2018, having previously delivered the Offering Materials to Westlake, Defendant Parker travelled to Plano, Texas to attend and conduct a meeting of potential Westlake investors into Alabama Plast (the "Plano Investor Meeting").

25.     While certain of the investors attended the Plano Investor Meeting in person, the meeting was broadcast interstate via Skype to other attendees that were out of state and that could not attend in person.

26.     During the course of the Plano Investor Meeting, Defendant Parker reiterated and confirmed the details of the Offering Materials Representations, including but not limited to the fact that Parker and Parker LLC had contracts to

represent numerous municipalities in the Opioid Litigation, including extremely valuable contracts with the City of Houston, Texas and Washington D.C.

27.     In response to specific questions posed by the potential investors, Parker made the following additional representations, among others (hereinafter referred to as the "Meeting Representations"):[4]

a.  In response to a question regarding potential issues with illegal attorney fee-sharing, Parker represented that he had structured the arrangement with Alabama Plast to avoid any fee-sharing issues by having Alabama Plast share in Parker's and Parker LLC's "profits" instead of attorneys' fees; and that such an arrangement was in all things proper.

b.  In response to questions regarding how much effort does it take to sign up clients, Defendant Parker represented that, while it varied, he had literally had municipalities and/or facilities sign up as clients on a phone call.

c.  That he and his firm had a total of around 250 municipalities and facilities signed up as clients in the Opioid Litigation.

d.  That he was anticipating that he could double or triple their "portfolio" of clients (i.e. grow to 500 to 750 clients) in the "next six months."

e.  That the five law firms comprising the Plaintiff's steering committee in the Opioid Litigation were not in an advantageous position to acquire clients over Parker and his firm and that the members of the steering committee actually got their clients from Parker and other law firms like Parker.

f.  That Parker and Parker LLC's retained clients comprised 2% of the total population, and that it was expected to double or triple in the next four months.

## The Investment

---

[4]  The Offering Materials Representations, Municipality Representations, and Meeting Representations are hereinafter collectively referred to as the "Representations."

28.     Based upon the Offering Materials, and Defendants' representations, Plaintiff Westlake agreed to acquire the 1/6 interest in Alabama Plast for the sum of $6.5 million provided, however, that Defendants provide Plaintiff with access to the documents and information, including client retainer contracts and agreements, supporting the information provided in the Offering Materials and the Representations made (hereinafter referred to as the "Supporting Documentation").[5]

29.     The Plast Defendants, and each of them, assured Plaintiff that they had all of the documents, including the contracts, supporting the Representations made and the matters set forth in the Offering Materials.  The Plast Defendants, and each of them, further assured Plaintiff that they would forward the Supporting Documentation to Plaintiff.

30.      Beginning in or about December 2018, the Plast Defendants began pressuring Plaintiff into closing on the purchase of the 1/6 interest in Alabama Plast. The Plast Defendants represented to Plaintiff that it was a critical time for Alabama Plast to recruit and refer plaintiffs to Parker and Parker LLC and that Alabama Plast needed Plaintiff's investment immediately to pursue those opportunities.

31.     Plaintiff was reluctant to invest the entire $6.5 million into Alabama Plast without having an opportunity to review the Supporting Documentation.  While continuing to assure Plaintiff that the Supporting Documentation would be provided, the Plast Defendants induced Plaintiff into funding incremental amounts of the

---

[5] The Supporting Documentation included, among other things, client retainer/fee agreements, co-counsel agreements, valuations and appraisals, Alabama Plast financial documents, Alabama Plast banking and account documents, and Alabama Plast governing documents.

purchase price through representations that Alabama Plast desperately needed the money to fund recruitment and referral activities; or risk losing any chance of enrolling prime targeted, high-value, plaintiffs for the Opioid Litigation.

32.     While continuing to demand the Supporting Documentation, and based, in part, upon the Plast Defendants' representations and assurances, that the documentation was forthcoming, and that the documentation supported the Representations made and the information contained in the Offering Materials, Plaintiff made the following payments, totaling $739,000.00, via wire transfer from its account to Alabama Plast (collectively the "Wire Transfers"):

    a.  December 20, 2018, in the amount of $100,000.

    b.  December 31, 2018, in the amount of $249,990.00.

    c.  July 3, 2019, in the amount of $19,000.00.

    d.  July 26, 2019, in the amount of $25,000.00.

    e.  July 26, 2019, in the amount of $50,000.00.

    f.  August 1, 2019, in the amount of $50,000.00.

    g.  August 30, 2019, in the amount of $50,000.00.

    h.  September 3, 2019, in the amount of $75,000.00.

    i.  December 2, 2019, in the amount of $25,000.00.

    j.  December 3, 2019, in the amount of $100,000.00.

    k.  February 14, 2020, in the amount of $50,000.00.

33.     In addition to the Wire Transfers, Westlake paid an additional $100,000.00 into Alabama Plast's bank account (the "Deposit").

34.     All told, Plaintiff Westlake paid a total of $893,000 to Alabama Plast, purportedly as part of its purchase of a one-six membership interest in the entity (the "Westlake Payments").

35.     The Westlake Payments were paid to Alabama Plast as and when the Plast Defendants advised that they needed monies to purportedly conduct Alabama Plast's business.

## Defendants' Rope-a-Dope

36.     As a purported member of Alabama Plast, Plaintiff Westlake requested that the Plast Defendants provide it with access to the Supporting Documentation, including but not limited to the purported fee agreements, co-counsel agreements and other information to support the Representations made and the information contained in the Offering Materials.

37.     At all relevant times when the Plast Defendants were soliciting Plaintiff's investment, the Plast Defendants represented that the most valuable claims in the Opioid Litigation, and the settlements thereof, belonged to the municipalities, and that Parker and Alabama Plast had secured at least 16 municipalities as clients; with Alabama Plast's interest in those claims totaling more than $1 billion.

38.     Despite the Plast Defendants' commitments to provide the Supporting Documentation when inducing Plaintiff to acquire an interest in Alabama Plast and Westlake Payment, the Plast Defendants refused to provide any of the information that the Plast Defendants had promised and that Plaintiff Westlake requested.

39.     The Plast Defendants were unable to provide any evidence that any of the valuable municipalities that were represented to have executed fee agreements, had ever retained Parker and/or Parker LLC as counsel or co-counsel.

40.     In response to their inability to provide the Supporting Documentation, including any documentation to support the Municipalities Representations, the Plast Defendants "shifted gears," disavowed that the municipalities were the "preferred" clients, and represented that the claims belonging to hospitals and medical providers were in fact the more valuable, preferred, claims (the "Preferred Client Representation").

## The Discovery of the Fraud

41.     Plaintiff eventually discovered that, despite the many Representations, in the Offering Materials, at the Plano Meeting and during the parties' interactions and discussions, Parker did not have a co-counsel relationship with any, or substantially any, of the 16 municipalities and that the Plast Defendants' Representations were false (the "Municipality Client Representations").

42.     As a result of, among other things, the Plast Defendants' failure and repeated refusal to provide the Supporting Documentation, and the discovery that the Representations, including the Municipality Representations and the Meeting Misrepresentations were false, Plaintiff ceased funding monies into Alabama Plast.

43.     With heightened concern, Plaintiff discovered many disturbing facts regarding the Plast Defendants and its purported investment.

44.    First, Plaintiff discovered that Alabama Plast and its members never consented to or approved Plaintiff's admission into the limited liability company as required under the Alabama Plast Operating Agreement.

45.    Second, Plaintiff discovered that Defendant Arledge was a convicted felon and a disbarred attorney; disturbing material facts that were never disclosed to Plaintiff (the "Arledge Disbarments").  The Arledge Disbarments were particularly disturbing because the three disbarments, and the federal felony convictions, all related to Arledge's participation in an illegal referral and attorney fee-sharing scheme that Arledge perpetrated in the Fen-Phen litigation and settlements.

46.    Third, the Arledge Disbarments exposed that the relationship and agreements between Alabama Plast, on the one hand, and Parker and Parker LLC, on the other, was an illegal fee-sharing scheme, and that the Plast Defendants' representations to the contrary, including during the Plano Meeting, were false.

47.    Fourth, the Plast Defendants Representations, including the representations regarding identity and extent of Parker and Parker LLC's enrolled clients, were all false.  Representations of Alabama Plast interests of over one billion dollars, that there were at least 250 clients comprising 2% of the population (which would be doubled or tripled in four to six months), were stunningly false.

**The DC Plast Cover-Up**

48.    In February 2020, Defendants sought to cover-up the illegal fee-sharing arrangement between and among Alabama Plast, Parker and Parker LLC.

49.     As part of the cover-up, Defendant Wells, a licensed attorney in Washington D.C. and Louisiana, formed a new and separate entity, DC Plast, bearing the identical name of Plast, LLC as Alabama Plast.  Importantly, DC Plast and Alabama Plast, although they share identical names, exist today as totally separate entities with totally separate and ongoing existences.  Plaintiff is not a member of DC Plast.

50.     While Alabama Plast is organized and existing under the laws of the State of Alabama, DC Plast is separately organized and existing under the laws of Washington DC.  None of the members of DC Plast are licensed to practice law in Washington D.C.

51.     Defendant Wells represented to Plaintiff that by organizing DC Plast as a Washington D.C. entity, Parker and Parker LLC could legally share attorneys' fees that they earned with DC Plast, even though Parker and Parker LLC are not licensed to practice law in Washington D.C.  Thus, according to Defendant Wells's representations and advice, DC Plast could legally share in and receive attorneys' fees from the Parker and Parker LLC clients in the Opioid Litigation (the "Wells Representations").

52.     The Wells Representations were, of course, false.  First, while a D.C. licensed attorney may, under the appropriate circumstances, legally share attorneys' fees with non-attorneys, Defendants Parker and Parker LLC, the attorneys sharing the fees, are not licensed in Washington D.C.  Fee sharing with non-attorneys is illegal in all states that Parker and Parker LLC are licensed in.

53.     Further, there is absolutely no connection between the Opioid Cases and Washington DC, as none of the cases are in Washington D.C.

54.     Finally, there is no licensed Washington DC attorney that owns any interest in DC Plast that is performing any work in the Opioid Cases with Parker and Parker LLC.  Defendant Wells has no ownership interest in DC Plast, is not co-counsel with Parker or Parker LLC on any of the Opioid Cases that Plast allegedly will share in the proceeds of, and, himself, is not entitled to any legal fees from the Opioid Cases.

55.     Plaintiff has never been provided with any documents, including any resolutions, operating agreements, governing documents, or filings evidencing DC Plast's actual, legal existence, or Plaintiff's purported ownership in DC Plast.  Under the circumstances, DC Plast is nothing more than a fraudulent entity designed to evade the legal prohibitions against attorney fee sharing.

56.     Upon information and belief, based upon the fact that Defendant Wells is both the organizer of and the registered agent for Defendant DC Plast, Defendant DC Plast's registration documents were sent to Washington DC from Louisiana and, therefore, were transmitted in interstate commerce.

## Plaintiff's Demands

57.     Plaintiff was fraudulently induced into funding $893,000 into Alabama Plast.

58.     As a result of the fraud perpetrated, Plaintiff made demand upon Plaintiff for a return of the $893,000 funded, as well as damages caused by the Plast Defendants' fraud.

59.     Defendants have never alleged that Plaintiff has ever breached any agreement or engaged in any wrongful conduct; nor have they ever made demand upon Plaintiff for any alleged breach, tort or damages.

## The Extortionist Lawsuit

60.     Commencing in or about June 2020, and continuing through January 14, 2021, the Plast Defendants represented and assured Plaintiff that they were going to "purchase Plaintiff's interest" in response to Plaintiff's demands and to settle Plaintiff's claims.

61.     For months, the Plast Defendants represented that they were going to acquire Plaintiff's interests, and for months, the Plast Defendants' representations proved to be false.

62.     After seven months of getting the run around, Plaintiff notified the Plast Defendants that, if the matter was not resolved by January 15, 2021, Plaintiff would be left with no choice but to file suit against the Defendants.

63.     On or about January 13, 2021, Defendant Daniels represented that he and the Plast Defendants' attorney, John Eaves, wanted to fly to Dallas and meet with Westlake in person on Tuesday, January 19, 2021, to propose a resolution of Plaintiff's claims.   Plaintiff accepted Defendant Daniels's offer, but advised that

Plaintiff was preparing to file and serve a lawsuit if an agreement could not be reached at the January 19, 2021, meeting.

64.     On January 14, 2021, the Plast Defendants, acting by and through Defendants Parker and Parker LLC, filed a lawsuit against Westlake and its members in the Circuit Court of Mobile County, Alabama, Case No. 02-CV-2021-900077.00, styled *Plast, LLC, et al v. Westlake OIG, LLC, et al.* (the "Alabama Suit").

65.     Upon information and belief, although not on the pleading, Eaves, or attorneys in his law firm, prepared, or at least assisted in preparing, the Alabama Suit.

66.     Defendants did not notify Plaintiff or Plaintiff's members of the Alabama Suit, and, prior to filing the suit, or even since filing the suit, never made demand of any kind upon Plaintiff or its members.  At no time, before or after Defendants filed the Alabama Suit, have Defendants ever even alleged that Plaintiff or Plaintiff's members have engaged in any wrongful or actionable behavior.

67.     Plaintiff discovered on its own that Defendants had filed the Alabama Suit.  When Plaintiff confronted Defendant Daniels about the suit, Defendant Daniels disclosed that Eaves had prepared the complaint filed in the suit, that the Defendants approved the filing of the suit, and that the Alabama Suit was meant to force Plaintiff to accept a buyback of its interest on terms that Plaintiff would not otherwise accept without the suit being filed.  In other words, Defendants filed the suit to extort consideration out of Plaintiff.

68.     Upon information and belief, based upon the information that Eaves, who lives and works in Mississippi, prepared the Alabama Suit Complaint (the "Alabama Complaint"), the complaint was transmitted in interstate commerce from Eaves to Parker for filing in the Circuit Court of Mobile County, Alabama.

69.     The Alabama Complaint, and the allegations contained therein, are wholly groundless and constitute a fraudulent filing.   The sole purpose of the Alabama Complaint is to extort Plaintiff.

## FIRST CAUSE OF ACTION
### Racketeer Influenced and Corrupt Organizations Act
### (18 U.S.C. 1961, *et seq.*)

70.     Plaintiff hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

71.     The Defendants conducted and continue to conduct their business through legitimate and illegitimate means in the form of an association-in-fact enterprise as defined in 18 U.S.C. § 1961(4) (the "RICO Enterprise").  In the instant case, the RICO Enterprise includes both the Defendants named in the case, and possesses the following characteristics: 1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose.

72.     The members of the RICO Enterprise are the Defendants, Mr. Eaves, and the law firm's and counsel with whom Defendant Parker and Parker LLC purportedly have a co-counsel relationship in the Opioid Litigation.

73.     The purpose of the RICO Enterprise is to obtain and expend money and

resources, and to illegally split legal fees, to solicit and obtain plaintiffs to represent in the Opioid Litigation.

74.     The participants in the RICO Enterprise have relationships with each other in that each is a participant in the scheme to illegally obtain money, resources and clients to retain members of the Enterprise as legal counsel and co-counsel in the Opioid Litigation.

75.     The Enterprise has had sufficient longevity, and continues to exist, to provide the associates of the Enterprise sufficient time to pursue the Enterprise's purpose.

76.     Plaintiff is a victim of the Enterprise in that, through the predicate acts perpetrated, the Enterprise fraudulently obtained, and has, through extortionist tactics attempted to retain, hundreds of thousands of dollars from Plaintiff to fund the Enterprises purpose and illegal activities.

77.     Defendants, aiding and abetting one another and others known and unknown to Plaintiff, used and caused to be used facilities in interstate commerce with the intent to promote, manage, establish, carry on, distribute the proceeds of, and facilitate the promotion, management, establishment, carrying on, and distribution of the proceeds of an unlawful activity, that is, the illegal recruiting and referral of litigation plaintiffs and the illegal sharing of attorneys' fees with non-attorneys in furtherance of that purpose.   Defendants' acts and omissions are violations of 18 U.S.C. 1952.

78.     Plaintiff expressly pleads causes of action pursuant to the Racketeer

Influenced Corrupt Organizations Act, as embodied in 18 U.S.C. §1962(a)-(d).

79.     The facts establish that Defendants, individually and with the help of their co-conspirators, have engaged in a pattern of racketeering activity that is in furtherance of and supported by the RICO Enterprise.

80.     The Defendants committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (*i.e.* violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the Defendants committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the Defendants' regular use of the facilities, services, distribution channels, and members of the Defendants.   The Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

81.     The Defendants used, directed the use of, and/or caused to be used, interstate mail and wire communications in service of their scheme through uniform misrepresentations, concealments and material omissions regarding the legality of their activities to solicit and refer plaintiffs, their illegal fee sharing, their fraudulent representations regarding the nature, scope and extent of their "clients," and their extortionist filing of the Alabama Lawsuit.

82.     In devising and executing the illegal scheme, the Defendants devised and knowingly carried out a material scheme and/or artifice to defraud by means of

materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the illegal scheme, the Defendants committed these racketeering acts intentionally and knowingly with the specific intent to advance the illegal scheme.

83.     The Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

a.     Mail Fraud: The Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail, commercial interstate carriers, or electronic communications in interstate commerce, for the purpose of executing the unlawful scheme to solicit and refer party plaintiffs, and to defraud parties, including Plaintiff, into funding their scheme and purpose.

b.     Wire Fraud: The Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme.

c.     Mail Fraud/Wire Fraud: The Defendants violated 18 U.S.C. §§ 1341 and 1343 by sending, or causing to be sent, and/or received, or by transmitting, materials by mail or wire for the purpose of extorting Plaintiff.

84.     Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and the plaintiff parties illegally solicited and referred.

85.     Defendants calculated and intentionally crafted the enterprise and their scheme to increase and maintain their increased profits, without regard to the effect such behavior would have on its victims, including Plaintiff.

86.     In designing and implementing the scheme, Defendants knew the

Plaintiff would rely upon the fraudulent misrepresentations, mailings and electronic wire communications and transfers to pay Defendants hundreds of thousands of dollars to sustain their scheme.

87.     The Defendants' predicate acts and pattern of racketeering activity were a substantial and foreseeable cause of Plaintiff's injury and the relationship between the Defendants' conduct and Plaintiff's injury are logical and not speculative. It was foreseeable to the Defendants that when they engaged in the RICO activities alleged herein, it would result in Plaintiff remitting hundreds of thousands of dollars by wire transfer to Defendants and that Plaintiff would be logically, substantially, and foreseeably harmed as a result.

88.     The Defendants' predicate acts and pattern of racketeering activity were a substantial and foreseeable cause of Plaintiff's injury and the relationship between the Defendants' conduct and Plaintiff's injury is logical and not speculative.

89.     The Defendants did not undertake the practices described herein in isolation, but as part of a common scheme. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, may have contributed to and/or participated in the scheme with the Defendants in these offenses and have performed acts in furtherance of the scheme to increase resources to continue to perpetrate the scheme.

90.     The Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

91.  The Defendants, with knowledge and intent, agreed to the overall objective of their fraudulent scheme and participated in the common course of conduct.

92.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the sale of the illegal interest in Alabama Plast and the illegal recruiting and referral of plaintiffs for the Opioid Litigation.  The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated event.

## SECOND CAUSE OF ACTION
Fraud

93.  Plaintiff hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

94.  Defendants' acts and omissions, as detailed above, constitute fraud by affirmative misrepresentations and fraud by concealment.

95.  Defendants made numerous Representations, in the Offering Materials, at the Plano Meeting, and otherwise, that were material and that were false.  Such misrepresentations included Defendants misrepresentations:

    a.  That Defendants had secured fee agreements in place with 250 clients comprising 2% of the population, including 16 different municipalities;

    b.  That Alabama Plast's interest in the municipality claims alone totaled $1,047,325,640.31;

c. That Alabama Plast's interest in Community Health Clinic Claims totaled $24,066,666.70;

d. That Alabama Plast could legally share in attorneys' fees with Parker and Parker LLC generated in the Opioid Litigation.

96. Defendants further concealed material facts that Defendants were obligated to disclose to Plaintiff in connection with the solicitation of Plaintiff's investment into Alabama Plast including:

a. That Arledge, a member of Alabama Plast, was a convicted felon;

b. That Arledge, a member of Alabama Plast, was disbarred in three states;

c. That Arledge, a member of Alabama Plast, was convicted and disbarred for the illegal referral of plaintiffs in mass tort litigation; and

d. That Arledge, a member of Alabama Plast, was convicted and disbarred for the illegal sharing of legal fees with non-attorneys in mass tort litigation;

97. The affirmative misrepresentations and the information concealed were material to Plaintiff's decision to invest in Alabama Plast.  Defendants' made the misrepresentations and concealed the information knowingly, with the intention that Plaintiff rely upon it, and Plaintiff did rely upon it.

98. Plaintiff has been damaged as a result of Defendants' fraud.

99. Plaintiff is entitled to recover punitive damages of and from each of the Defendants as a result of Defendants' fraud.

## REMEDIES UNDER 18 U.S.C. § 1964(a)

100.    Plaintiff hereby incorporates by reference all other paragraphs of this Complaint as if fully set forth herein, and further alleges as follows.

101.    Defendants have engaged, and by all accounts will continue to engage, in a RICO Enterprise the object of which is, in part, to: a) illegally solicit, recruit and refer party plaintiffs for prosecution of claims in the Opioid Litigation; b) illegally share attorneys' fees with non-licensed attorneys; and c) fraudulently raise money from innocent investors to maintain and fund the RICO Enterprise and scheme.

102.    The RICO Statute provides the Courts with jurisdiction to:

> Prevent and restrain violations of section 1962 of the chapter by issuing appropriate orders, including but not limited to: order any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

103.    Without the Court's intervention, Defendants have demonstrated they will continue to engage in the continued endeavors of the RICO Enterprise.  Notably, in this regard, Defendants have welcomed, utilized, defended, and concealed the history of, Defendant Arledge, who has previously been convicted of and disbarred for the almost identical illegal activities, in their pursuit and accomplishment of the continued endeavors of the RICO Enterprise.

104.    The Court can and should:

    a. Order that Defendants themselves of any and all interest, direct or

indirect, in Alabama Plast and DC Plast:

b. Prohibit Defendants from engaging in the same illegal solicitation, recruiting and referral of party plaintiffs in the Opioid and all other litigations;

c. Prohibit Defendants from sharing attorneys' fees with non-attorneys; and

d. Prohibit Defendants from raising any monies from any third parties to fund their illegal activities and the RICO Enterprise.

**THEREFORE**, Westlake prays that Defendants be cited to appear and answer, and that:

**(1)** Westlake be awarded judgment against Defendants for its actual damages, consequential, incidental and special damages;

**(2)** Westlake be awarded treble the amount of actual damages as statutory damages under the RICO Statute;

**(3)** Westlake be awarded judgment against Defendants for punitive damages in not less than three times the amount of Westlake's actual damages;

**(4)** The Court enter Orders against Defendants pursuant to 18 U.S.C. 9 1964(a), as pled for above;

**(5)** Westlake be awarded judgment against Defendants for Westlake's attorneys' fees, costs of court, along with pre- and post-judgment interest as allowed by law; and

**(6)** Westlake be awarded such other and additional relief, at law or in equity, to which it may show itself justly entitled.

Respectfully submitted,

/s/ *Ryan K. Lurich*

By: _____

**Jason H. Friedman**
Texas Bar No. 24059784
**Ryan K. Lurich**

Texas Bar No. 24013070
**James R. Krause**
Texas Bar No. 11714525

**FRIEDMAN & FEIGER, LLP**
5301 Spring Valley Road, Suite 200
Dallas, Texas 75254
Telephone (972) 788-1400
Facsimile (972) 788-2667

**ATTORNEYS FOR PLAINTIFF**
**WESTLAKE OIG, LLC**

# EXHIBIT A

## RESOLUTION TO ADMIT NEW MEMBER TO PLAST, LLC

On the 1st day of June, 2018, a special meeting was held by the members of PLAST, LLC. The purpose of the meeting was to discuss the sale of an undivided one-sixth (1/6th) interest in PLAST, LLC for the sale price of Six Million Five Hundred Thousand ($6,500,000.00) Dollars. This sale of an undivided one-sixth (1/6th) interest for the price of Six Million Five Hundred Thousand ($6,500,000.00) Dollars was agreed to by unanimous vote of the five members of PLAST, LLC based upon PLAST, LLC's interest in opioid claims currently signed and under contract and in accordance with section 2.02 of the PLAST, LLC Operating Agreement. Sale proceeds, less any fees for obtaining said investor, shall be evenly disbursed to the five existing members of PLAST, LLC to compensate them for work and expenses previously incurred and to compensate them for the dilution of their respective undivided 20% interest as members of PLAST, LLC.

It was further agreed to, by unanimous vote, that the purchaser of said undivided one-sixth (1/6th) interest in PLAST, LLC shall be entitle to receive his original Six Million Five Hundred Thousand ($6,500,000.00) Dollar purchase price back from fee paid on settled Opioid Claims prior to any money being disbursed to any other PLAST, LLC members. Once he has received disbursements equal to his original Six Million Five Hundred Thousand ($6,500,000.00) Dollar purchase price, he shall thereafter receive only his undivided one-sixth (1/6th) interest as will the other members of PLAST, LLC.

This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

Said Resolution is hereby adopted, by unanimous vote, as evidenced by the signature of the members of PLAST, LLC. This 1st day of June, 2018.

_____
Robert C. Arledge, Member

_____
Lydia M. Lafleur, Member

_____
Frank Parker, Member

_____
C. Ronnie Shows, Member

_____
Roosevelt (Trey) Daniels, Member

## RESOLUTION TO ADMIT NEW MEMBER TO PLAST, LLC

On the 1st day of June, 2018, a special meeting was held by the members of PLAST, LLC. The purpose of the meeting was to discuss the sale of an undivided one-sixth (1/6th) interest in PLAST, LLC for the sale price of Six Million Five Hundred Thousand ($6,500,000.00) Dollars. This sale of an undivided one-sixth (1/6th) interest for the price of Six Million Five Hundred Thousand ($6,500,000.00) Dollars was agreed to by unanimous vote of the five members of PLAST, LLC based upon PLAST, LLC's interest in opioid claims currently signed and under contract and in accordance with section 2.02 of the PLAST, LLC Operating Agreement. Sale proceeds, less any fees for obtaining said investor, shall be evenly disbursed to the five existing members of PLAST, LLC to compensate them for work and expenses previously incurred and to compensate them for the dilution of their respective undivided 20% interest as members of PLAST, LLC.

It was further agreed to, by unanimous vote, that the purchaser of said undivided one-sixth (1/6th) interest in PLAST, LLC shall be entitle to receive his original Six Million Five Hundred Thousand ($6,500,000.00) Dollar purchase price back from fee paid on settled Opioid Claims prior to any money being disbursed to any other PLAST, LLC members. Once he has received disbursements equal to his original Six Million Five Hundred Thousand ($6,500,000.00) Dollar purchase price, he shall thereafter receive only his undivided one-sixth (1/6th) interest as will the other members of PLAST, LLC.

This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

Said Resolution is hereby adopted, by unanimous vote, as evidenced by the signature of the members of PLAST, LLC. This 1st day of June, 2018.


_____
Robert C. Arledge, Member

_____
Lydia M. Lafleur, Member

_____
Frank Parker, Member

_____
C. Ronnie Shows, Member

_____
Roosevelt (Trey) Daniels, Member

## RESOLUTION TO ADMIT NEW MEMBER TO PLAST, LLC

On the 1st day of June, 2018, a special meeting was held by the members of PLAST, LLC. The purpose of the meeting was to discuss the sale of an undivided one-sixth (1/6th) interest in PLAST, LLC for the sale price of Six Million Five Hundred Thousand ($6,500,000.00) Dollars. This sale of an undivided one-sixth (1/6th) interest for the price of Six Million Five Hundred Thousand ($6,500,000.00) Dollars was agreed to by unanimous vote of the five members of PLAST, LLC based upon PLAST, LLC's interest in opioid claims currently signed and under contract and in accordance with section 2.02 of the PLAST, LLC Operating Agreement. Sale proceeds, less any fees for obtaining said investor, shall be evenly disbursed to the five existing members of PLAST, LLC to compensate them for work and expenses previously incurred and to compensate them for the dilution of their respective undivided 20% interest as members of PLAST, LLC.

It was further agreed to, by unanimous vote, that the purchaser of said undivided one-sixth (1/6th) interest in PLAST, LLC shall be entitle to receive his original Six Million Five Hundred Thousand ($6,500,000.00) Dollar purchase price back from fee paid on settled Opioid Claims prior to any money being disbursed to any other PLAST, LLC members. Once he has received disbursements equal to his original Six Million Five Hundred Thousand ($6,500,000.00) Dollar purchase price, he shall thereafter receive only his undivided one-sixth (1/6th) interest as will the other members of PLAST, LLC.

This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

Said Resolution is hereby adopted, by unanimous vote, as evidenced by the signature of the members of PLAST, LLC. This 1st day of June, 2018.


_____
Robert C. Arledge, Member


_____
Lydia M. Lafleur, Member


_____
Frank Parker, Member


_____
C. Ronnie Shows, Member


_____
Roosevelt (Trey) Daniels, Member

# EXHIBIT B

## OFFER TO SALE MEMBERSHIP IN PLAST, LLC

**Offer:**

The Members of PLAST, LLC are offering to sell an equal one-sixth (1/6) interest in PLAST, LLC.

**Price:**

**Six Million Five Hundred Thousand ($6,500,000.00) Dollars USA**

**Use of Funds:**

The funds will be used to compensate the current five members of PLAST for the work and expenses they have expended securing the current inventory of opioid claimants and to compensate the original five members for the dilution of their undivided 20% interest which will result from the inclusion of a sixth member.

**Definitions:**

**Profits shall be defined as:** Gross fees received by Frank Parker Law less recoverable expenses.

**Recoverable expenses are defined as:** Expenses incurred by Frank Parker Law but **shall not** include hotel costs, meals, entertaining expenses, airfare, taxi fees, rental car costs, cell phone expenses, copying costs, travel expenses, office supplies, postage, secretarial expenses, rent, utilities, research fees, and/or any case costs to be reimbursed by the claimant.

**General:**

PLAST, LLC is a five member Alabama Limited Liability Company established for the expressed purpose of identifying and signing up potential claimants for participation in the ongoing MDL Opioid Litigation being adjudicated in the United States District Court for the Northern District of Ohio. PLAST, LLC has an agreement with one of its members, Frank Parker Law and its owner Frank Parker, located in Mobile, Alabama, that any profits receives by Frank Parker Law and/or Frank Parker from the Opioid Litigation will be deposited into PLAST, LLC operating account and paid equally to the members of PLAST, LLC. Frank Parker Law and/or Frank Parker has a co-counsel agreement with the Law Firm Beasley Allen, Montgomery, Alabama, that the Beasley Allen firm will pay Frank Parker a referral fee equal to one third (1/3) of the fee received by Beasley Allen on any Opioid Claims generated by Frank Parker. All the members of PLAST, LLC are currently engaged in the identification of potential Opioid claimant, which are then signed to a contingency fee agreement identifying both the Beasley Allen and Frank Parker Law as counsel of record.

**Potential Claimants:**

Potential Opioid Claimants include:

1. States;
2. Counties/Parishes;
3. Municipalities;
4. Labor Unions;
5. Health Care Facilities; and
6. Health Insurance Companies.

**Inventory of Claimants:**

Our current inventory of claimants include municipalities and health care facilities with a current conservative gross value of approximately $1,750,000,000.00. These entities will generate gross fees of $583,333,333.00. Frank Parker Law's share of these fees will generate profits to be deposited in PLAST, LLC of approximately $194,444,444.44, resulting in a disbursement to each member, including a sixth new member of approximately, $32,407,407.40.

We believe based upon extremely conservative estimates and the current posture of discussions with new potential Opioid participants that within the next 120 days our current inventory of claims will increase sufficiently to increase the profit share allocated to PLAST, LLC to a figure in excess of 500,000,000.00. This will result in a disbursement to each member of PLAST, LLC, including a sixth new member, of $83,333,333.33.

**Status of the Litigation:**

All though no one has a "crystal ball", we believe based upon the current status of settlement negotiations that the first round of claims will be settled within the next six to nine months. Based upon our best information and belief, the pharmaceutical defendants have reserved in excess of One Hundred Billion ($100,000,000,000.00) Dollars to settle the first wave of claims.

**Disclosure:**

The projected recovery contained in this offer are estimates based our best information and belief; however, this figure are only intended to be illustrative and do not constitute a guarantee of any recovery. This offer **is not** intended as a sale of a security.

**Confidentiality:**

**ANY AND ALL INFORMATION CONTAINED IN THIS OFFER ARE CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY THIRD PARTY WITHOUT THE EXPRESSED WRITTEN PERMISSION OF PLAST, LLC.**

## BACKGROUND INFORMATION ON LAW FIRMS FRANK PARKER LAW WILL CO-COUNSEL WITH IN THE OPIOID LITIGATION

**Beasley Allen:**

In 1978, Jere Locke Beasley founded the firm now known as Beasley, Allen, Crow, Methvin, Portis & Miles, P.C., which is located in Montgomery, Alabama and Atlanta, Georgia. This was the genesis of the present law firm, which is now made up of seventy-seven attorneys and approximately two hundred support staff representing clients all over the country. Beasley Allen is adequately qualified, prepared, and equipped to handle complex litigation on a national scale. Beasley Allen's highly qualified attorneys and staff work tirelessly for clients throughout the country, representing plaintiffs and claimants in the following areas: Personal Injury, Products Liability, Consumer Fraud, Class Action Litigation, Toxic Torts, Environmental Litigation, Business Litigation, Mass Torts Drug Litigation, and Nursing Home Litigation. We have handled cases involving verdicts and settlements amounting to nearly $30 billion. For instance, Beasley Allen has played an integral role in this nation's most important consumer litigation such as Vioxx MDL, BP MDL, Toyota SUA MDL, VW MDL, Chrysler Fiat MDL and many others.

**Levin Papantonio Law Firm:**

David Levin and Reubin Askew started our law firm in Pensacola, Florida, in 1955. Since that time, we have grown to 40 attorneys, and have earned a reputation as one of the most successful personal injury law firms in America. We represent clients in all 50 states and have won more than $4 billion in jury verdicts and settlements. Our law firm is currently representing more than 450 governmental agencies against wholesale distributors and manufacturers of opioids in order to recover the immense damages they have sustained as a result of these companies creating the current opioid epidemic. Levin Papantonio is one of the very few law firms that have been appointed to the Opioid Plaintiffs Executive Committee by the judge overseeing the actions against the opioid manufacturers and distributors. This means that they have a directly involved in the settlement negotiations, national investigation and discovery against these companies that will hopefully result in a positive outcome for the claimants who have been paying the costs of this epidemic. They have been in business for more than 60 years, and are seen as a national leader in this type of litigation. This firm has recovered hundreds of billions of dollars on behalf of their clients in complex multi-district litigation. Members of the firm are routinely selected to chair and/or participate on the executive committee of virtually every MDL filed in the United States.

**Green Ketchum Law Firm:**

Greene, Ketchum, Farrell, Bailey & Tweel, LLP is a personal injury law firm in Huntington, Cabell County, WV. Greene Ketchum's hometown of Huntington has often been called the epicenter of the opioid epidemic and featured on shows like 60 minutes and Netflix's Heroin (e). Huntington's plight has also been the center of several national publications including The New York Times and

The Washington Post. In early 2017, Greene Ketchum filed the nation's first lawsuits in federal court against the wholesale distributors of opioids on behalf of six West Virginia counties. Realizing the problem was bigger than just West Virginia, Greene Ketchum partner, Paul Farrell, Jr., went to work forming a "National Consortium" to fight the epidemic. Today, the team tackling the opioid epidemic consists of Levin Papantonio; Greene, Ketchum, Farrell, Bailey & Tweel LLP; Baron & Budd PC; Hill, Peterson, Carper, Bee & Deitzler PLLC; McHugh Fuller; and Powell & Majestro PLLC.

For 60 years, Greene, Ketchum, Farrell, Bailey & Tweel LLP has been committed to fighting for justice for their clients. With four partners, the firm operates as an elite litigation team. The firm is experienced in handling mass litigation (having filed and tried to verdict some of the first transvaginal mesh (TVM) cases in the country), pharmaceutical litigation, toxic tort litigation, product liability litigation and chemical spill litigation. The firm also has experience handling litigation on behalf of public entities like the State of West Virginia. Greene Ketchum's attorneys have successfully tried numerous civil cases to verdict in state and federal courts. Their skilled advocacy has resulted in record breaking verdicts and judgments and millions of dollars in verdicts and settlements for clients. For their work, the firm's attorneys have been recognized by legal organizations for excellence and included in The National Advocates Top 100 Trial Lawyers and West Virginia Super Lawyers. The Green Ketchum Firm **has** fought and won cases against giants such as Big Tobacco, BP, Bayer, Merck, Bard and Dupont to name just a few.

**Summary:**

The co-counsel firms selected by Frank Parker Law have each been appointed to significant leadership roles in the Opioid Multi District Litigation by the judge. Paul T. Farrell, Jr. of Greene Ketchum, was appointed as one of three Co-Lead Counsel for Plaintiffs, Troy Rafferty of Levin Papantonio was appointed Co-Liaison Counsel for Plaintiffs, and Peter Mougey of Levin Papantonio, was appointed to the Plaintiffs' Executive Committee.

## VALUATION

**This valuation was prepared to show the veracity of purchasing a 1/6th undivided interest in PLAST, LLC at the purchase price of Six Million Five Hundred Thousand ($6,500,000.00) Dollars.**

## Similarities between an Opioid Settlement and the structured used in the Tobacco Settlement:

Although the global tobacco settlement is reported to have been a $256 Billion Dollar Settlement, that figure is a bit misleading. Pursuant to the Global Tobacco Settlement, the participating states were paid an initial collective lump sum of $256 Billion Dollars. However, that figure does not account for the continued payments in perpetuity to the states based upon their respective market share of total national tobacco sales. Mississippi last year alone received over 120 Million from the tobacco settlement. Although the payments of attorneys' fees in the tobacco settlement are static and paid in equal installment over 25 years, the participating states will be paid in perpetuity.

We anticipate that a similar structure, as it relates to payment of claims in the opioid litigation will be employed. This is based, in part, on the fact that the opioid crisis and the damages claimants will continue to suffer will not end with the signing of a settlement agreement. As a result, any settlement will have to not only include a substantial lump sum payment for damages sustained in the past, but must also include a formula for the payment of future damages based upon a per capita calculation weighed against a per capita use of opioids. A similar formula for calculating ongoing damages will likely be used for all classifications of claimants' i.e.  States, Municipalities, Counties, Medical facilities, Treatment Facilities, Insurance Companies ect. We anticipate that this element of future damages will, as in the Tobacco Settlement, be paid in perpetuity or at a minimum over a five to ten years period following the settlement of the opioid claims.

## Overview:

The Opioid Crisis is a commercially created pandemic which was completely preventable. Nationwide, the number of opioid prescriptions rose from 76 million in 1991 to 259 million in 2012. By 2015, the amount of opioids prescribed was enough for every American to be medicated around the clock for three weeks.

Statistics indicate that there is a ninety (90%) percent chance of becoming addicted after only 4 days of continuing use of an opioid derivative pain killer.

In 2018, 43% of Americans say the use of prescription pain drugs is a serious problem in their community.

Opioid prescriptions and overdoses have quadrupled since 1999. Americans consume more opioids than any other country. Eighty-nine (89%) percent of all current heroin addicts in American say their addictions starting with a prescription to opioid derivative pain killers.

The damages are assessed over the entire twenty-year time period the Opioid Derivative Pain Killers have been fraudulently marketed. Purdue Pharma in 2007 paid $600 million and admitted to downplaying the addiction risks of Oxycontin, the company's flagship product.

1

Based on a Kaiser Foundation statement released April 5th of 2018, large employers alone spent a record $2.6 billion to treat opioid addiction and overdose in 2016, an eight-fold increase since 2004. The cost of an on-the-job injury is 9 times higher when a strong narcotic, such as Oxycontin, is used. The typical cost of a workplace injury is $13,000. The cost of a workplace injury when the employee has been prescribed an opioid painkiller is $39,000.

Opioid overdoses accounted for more than 33,000 deaths in 2015 – more than any other period in U.S. history. Drug overdoses now kill more people than gun homicides and car crashes combined. This number has grown exponentially each year since 2015.

The societal costs of abuse (healthcare, criminal justice, and loss of work productivity) amounted to $55.7 billion in 2007 alone.

---

References:

Centers for Disease Control, https://www.cdc.gov/drugoverdose/data/statedeaths.html; The American Academy of Pain Medicine: *Societal Costs of Prescription Opioid Abuse, Dependence, and Misuse in the United States.* https://www.asam.org/docs/advocacy/societal-costs-of-prescription-opioid-abuse-dependence-and-misuse-in-the-united-states.pdf ; Joint Economic Committee Democrats. https://www.jec.senate.gov/public/_cache/files/6c604f91-3d90-4b0e-bdec-25780bfc9167/state-opioid-epidemic-fact-sheets.pdf; 2010 Analysis by Accident Fund Holdings.; Insurance Journal, June 20, 2018, *Opioid Makers Endure Setback,* by Jef Feeley.

## Damages Sustained by States, Counties/Parishes and Municipalities

Governmental entities incur the following costs combat opioid abuse:

- Opioid-related hospitalization

- Drug education and rehabilitation

- Law Enforcement

- Court system and corrections

- Purchase and training in the use of Naloxone by First Responders

For example the addition of a single police officer due to increase in drug issues in a community can easily cost a small town $250,000.00 per year when you look at all the direct and indirect costs associated with the officer's employment to include, but not limited to, training, salary, vehicle, insurance, uniforms and supplies. It is easy to see that due to opioid crisis the increase of only 4 officers and the additional cost of incarceration can easily exceed the damage figures we used without any consideration for the costs of addiction services, loss of taxes, increases in insurance coverages, additional court personnel, additional jail cells, costs of treatment of addicted inmates, etc.

Also, the employees of these municipalities are not immune to suffering from opioid related issues. This results in the governmental entity incurring damages for loss of productivity, increased health insurance costs (many of these governmental entities are self-insured.)  Many of the employees have jobs that they would be prevented from performing while under the influence of Opioids. This means the governmental entities lose 100% of the benefit of these employees' services as a result of Opioid related issues.

Law Enforcement can't work while on Opioids;
Bus Drivers can't drive while on Opioid;
Firemen can't work while on Opioids;
Street Crew worker can't work while on Opioids;

In short any employee required to drive, operate heavy machinery or work in close proximity to dangerous materials can't perform their duties while on Opioids. (See: *PDR for Hydrocodone*)

Although, Governmental and municipal claimants have seen an exponential rise in the damages they are sustaining as a result of the opioid crisis over the last twenty years, for the purposes of these calculations we have calculated their documented per capita damages, as a direct result of the opioid crisis, for only the last four years. These are the municipalities Parker Law currently has under contract:

## TEXAS:

In the State of Texas, every resident has experienced damages of $653 per year for the last 4 years as a direct result of the Opioid Crisis. These per resident costs of the opioid crisis were derived from two study conducted by the **American Enterprise Institute,** The geographic Variation in the Cost of the Opioid Crisis (March, 2018); and **The United States Council of Economic Advisors**, (November, 2017).

| City | Population | Per Capita Cost/Year | Total Damages |
|------|-----------|---------------------|---------------|
| Houston, TX | 2,303,000 | $653 | $6,015,436,000.00 |
| PLAST, LLC's interest in this claim: | | | $668,381,777.78 |

## MISSISSIPPI:

In the state of Mississippi, every resident has experienced damages of $703 per year since 2015, as a direct result of the Opioid Crisis. These per resident costs of the opioid crisis were derived from two studies conducted by the **American Enterprise Institute,** The geographic Variation in the Cost of the Opioid Crisis (March, 2018); and **The United States Council of Economic Advisors**, (November, 2017).

| City | Population | Per Capita Cost/Year | Total Damages |
|------|-----------|---------------------|---------------|
| Petal, MS | 10,704 | $703 | $30,099,648 |
| Purvis, MS | 2391 | $703 | $6,723,492 |

3

| | | | |
|---|---|---|---|
| Collins, MS | 2590 | $703 | $7,283,080 |
| Yazoo City, MS | 14,550 | $703 | $40,914,600 |
| Natchez, MS | 15,109 | $703 | $42,486,508 |
| Covington County, MS | 16,953 | $703 | $47,671,836 |

The population of Covington County which is 19,543 was reduced by the population of its principal city Collin, Mississippi, which is listed above.

PLAST, LLC's interest in these claims:                    $19,464,351.56

**MISSOURI**:

In the State of Missouri, every resident has experienced damages of $1,727.00 per year for the last 4 years as a direct result of the Opioid Crisis. These per resident cost of the opioid crisis were derived from two study conducted by the **American Enterprise Institute,** The geographic Variation in the Cost of the Opioid Crisis (March, 2018); and **The United States Council of Economic Advisors,** (November, 2017).

| City | Population | Per Capita Cost/Year | Total Damages |
|---|---|---|---|
| Beverley Hills, MO | 597 | $1,727 | $4,124,076 |
| Cool Valley, MO | 1,175 | $1,727 | $8,116,900 |
| Northwoods, MO | 4,150 | $1,727 | $28,668,200 |
| Pagedale, MO | 3,292 | $1,727 | $22,741,136 |
| Pine Lawn, MO | 3,592 | $1,727 | $24,813,536 |
| Velda Village Hills, MO | 1,052 | $1,727 | $7,267,216 |
| Vinita Park, MO | 1,875 | $1,727 | $12,952,500 |
| Wellston, MO | 3,681 | $1,727 | $25,428,348 |
| Upland Park, MO | 443 | $1,727 | $3,060,244 |

PLAST, LLC's interest in these claims:                    $15,241,350.67

PLAST, LLC's total interest in all Municipal Claims:        $703,087,480.01

Data used in both studies was from 2015. Therefore, although the fraud covers a 20 year time period, we only calculated damages based upon a four year recovery.

References:

**American Enterprise Institute,** *The geographic Variation in the Cost of the Opioid Crisis* (March, 2018); and **The United States Council of Economic Advisors,** (November, 2017).

4

## Medical Facilities' Damages Assessment

Hospitals and/or medical clinics have incurred and will continue to incur a variety of expenses related to the ongoing opioid epidemic. For example, Community Health Clinics treat numerous patients for the following opioid related conditions: (1) opioid overdose; (2) opioid addiction; (3) neonatal treatment for babies born opioid addicted because their mothers were opioid addicts, which is intensive, complex, and lengthy; and (4) psychiatric and related treatment for opioid users who are committed to mental health treatment programs.

Moreover, opioid users often present themselves to hospitals and clinics claiming to have illnesses and medical problems, which are pretexts for obtaining opioids to satisfy their cravings. As such, hospitals and clinics incur operational costs, consisting of expending time and incurring expenses, in diagnosing, testing and otherwise dealing with pill seekers, before their true status can be determined. Hospitals and clinics also incur operational costs in the form of surgical procedures that are more complex and expensive than would otherwise be the case if the patients were not opioid addicts, which complicates surgical procedures and requires special protective measures.

Opioid patients often do not have health insurance, Medicare or Medicaid coverage. The costs of their treatment are not reimbursed and are lost to hospitals and clinics. Even in cases where there is insurance, hospitals and clinics may still incur a partial loss.

According to one study, the cost of treating opioid overdose victims in hospital intensive care units jumped 58 percent in a seven-year span. The same study also showed that the average cost of care per opioid admission increased from $58,500 to $92,400.[1]

Hospitals can easily quantify their damages because of their price lists, which set the prices for a comprehensive listing of items billable to a hospital patient or the patient's health insurance providers.

### Example

Publicly available data demonstrates how the opioid epidemic can impact a hospital. Here are some areas where the opioid epidemic has impacted hospitals:

- Neo-natal ICU: Neo-natal ICUs in the country with a capacity of 118 babies. Fifteen to twenty percent of the patients are opioid related. The neo-natal unit is consistently full. Opioid addicted babies can remain in the unit for 10 days or longer and are then transferred to a medical floor where they can remain for as long as two months. The cost for an admission of an opioid baby averages $66,000 while a non-opioid baby admission averages $3,500.

- Addiction Services for pregnant women and Infant's Center: Intervention program to identify and treat pregnant women.

---

https://khn.org/morning-breakout/the-cost-of-treating-an-opioid-overdose-92400/

- <u>Addiction Recovery Unit:</u> The hospital expanded this unit 60% in 2016 due to opioid admissions for a total of 16 beds. Most patients spend one month as inpatients and then two months as outpatients.

- <u>Emergency Room:</u> Hospitals have drug overdose admissions daily and on some days, multiple admissions. Many hospitals have instituted a program to provide Naloxone to overdose patients on discharge as well as a community program to distribute Naloxone. ER admissions would also include people suffering from drug withdrawal.

- <u>General Medical Hospital Admissions:</u> Complications related to opioid use such as IV infections of blood, heart infections, overdose, withdrawal, etc. Often very costly admissions.

- <u>Addiction Scholars Program:</u> Costs/opportunity costs for training two groups of 25 hospital staff over 15 months to deal with opioid related issues and provide guidance to hospital employees.

- <u>One-Stop Recovery Resource Center:</u> A collaborative of several agencies, where people can receive information, assessments and referrals for treatment.

- <u>Medicaid Reimbursement Differential:</u> For patients with Medicaid (see below), there is a possibility that a hospital could claim damages for the difference between the reasonable and customary charge for services that would be paid by insurance versus the lower Medicaid payments or the difference between actual costs versus what Medicaid paid.

Over a recent 10-year period, hospital inpatient treatment costs for opioid abuse increased from $4.57 billion to $14.85 billion and IV infection hospital inpatient treatment costs went from $190 million to $700 million. These costs do not include outpatient treatment following discharge.

Opioid related hospital admissions doubled between 2002 and 2012 and the average cost for inpatient opioid care per patient rose from $58,500 to $92,400 for 162 academic hospitals between 2009 and 2015.

Only 20% of opioid abuse patient admissions have private health insurance and only 14% of IV infection related patient admissions have private health insurance. This would indicate that hospitals have likely incurred substantial costs.

**Hospitals' Claims Valuation:**

The hospitals we have an interest in treated 63,333 underserved patients last year. Of the 63,333 patients treated sixty (60%) percent or 38,000 of these patients were taking opioid pain killers. Of the 38,000 opioid users treated last year fifty (50%) percent or 19,000 were uninsured and unable to pay. (50% unable to pay was consistent among the 19 clinics.)

Based upon data from ***Journal of Managed Care & Specialty Pharmacy (JMCP)*** the cost of treating an opioid using patient is $15,884-$18,388 as compared with only $1,830-$2,210 among

a similar group of patients who do not use opioids. This indicates an increase in the cost of treating an opioid user of $14,054-$16,178.

For the purpose of these calculations we used the low end of the actual costs of treating an opioid using patient versus treating a patient with a similar medical condition that does not use opioids. This figure ($14,054.00) was multiplied by the 19,000 non-paying opioid using patients. This equaled $267,026,000.00/year damages for all 19 clinics.

Patients treated last year 63,333
63,333 x .6 = 38,000 opioid users treated
38,000 x .5 = 19,000 opioid users' no-payment
19,000 x $14,054.00 = $267,026,000.00 x 4 years = $1,068,104,000.00/ 4 years damages
$1,068,104,000 / 19 clinics = $56,216,000 damages/clinic/ 4 years
$56,216,000 / 4 = $14,054,000.00/clinic/year
$1,068,104,000 / 3 = $356,034,666.67 Fees at 1/3
$356,034,666.67 / 3 = $118,678,222.22 PLAST
$118,678,222.22 / 6 = $19,779,703.70 1/6th share

## **Treatment Centers:**

We currently have six large treatment centers under contract. As a direct result of the opioid crisis, these facilities have had to redirect substantial resources to handle this epidemic. One owner has estimated his direct losses as a result of the treatment of opioid patient who cannot pay at 5,000/day/patient. This represents a costs of $2,500.00/ day for the actual treatment and $2,500.00/ day the facility is losing by not having a paying patient in the bed. This results in losses for the treatment of non-paying (Scholarship Patients) opioid victims at $150,000.00/month. At any given time these facilities have approximately 6 opioid victims who are not paying anything for their treatment. This results in actual losses to a facility of $10,800,000.00 per year.

This figure only includes the actual losses for non-paying/scholarship patients and does not place any valuation on the disproportion allocation of treatment resources this epidemic has placed on the Addiction Treatment Industry; nor, does it include the exponential increase we have seen over the last ten years in the costs of treatment, placing quality treatment options outside the reach of most Americans, including those with health care insurance.

We have conducted an exhaustive review of drug treatment benefits provided by the major health insurance companies. We have found no insurance policies that do not have large co-pays for residential drug treatment. Many of the policies we reviewed had co-pays for residential drug treatment in excess of $20,000.00. The lowest co-pay we found was $8,000.00 in a policy provided by Humana. For the purposes of these valuation calculations we used the lowest co-pay of $8,000.00.

In an effort to provide treatment most Drug Treatment Facilities have had to absorb these co-pays. This means that while the actual treatment of an opioid patient for thirty days in a residential drug treatment facility may exceed $2,500.00/day, these facilities have had to absorb $8,000.00 dollars

7

of that costs even for their patients with insurance. This means the Treatment Facility is losing a minimum of $8,000.00 per patient.

If we take a facility which has the ability to house 30 patients in a thirty day residential treatment setting with the facility absorbing the $8,000.00 co-pay, this result in a loss to the facility of $2,880,000.00/year for their patients who are insured. If we add only two scholarship patients to this calculation, the actual losses to the facility increase to $4,680,000.00/year as a direct result of the opioid crisis.

These facilities we have under contract have the ability to house 210 patients. This means based upon the above conservative calculations of damages these facilities have collective damages of:

Population: 210 x 12 = 2520/year
Scholarship Patients: 6 X 6 =36 x 12 = 432/year
Loss based on scholarship/non-paying patients: 432 x $150,000 = $64,800,000.00
Loss for absorbing co-pay of $8,000: 2,520 − 432(scholarship patients) = 2,088
2,088 x $8,000.00 (co-pay) = $16,704,000 losses/ year
Total Losses per Year: $16,704,000 + 64,800,000.00 = $81,504,000/ year
$81,504,000.00 / 6 = $13,584,000.00 Losses/ year/ facility
$81,504,000.00 x 4 = $326,016,000.00 Total Three Year damages
$326,016,000.00 /3 = $108,672,000.00 / 3= $36,224,000 to PLAST
$36,224,000.00 / 6 = $6,037,333.33 to 1/6th interest.

The total value of the clinics and treatment facilities in revenue to PLAST is:

$118,678,222.22 (Hospitals)
$ 36,224,000 (Treatment Facilities)
Total: $154,902,222.22 /6 = $25,817,037.04 to 1/6th interest

Total Value of the 1/6th interest based upon a conservative valuation of the claims we currently have under contract: **$142,998,283.71** even if each of these claimants' only receive 1 years damages the 1/6th interest will still be **$35,749,570.93.**

**Below Please find a list of potential claimants we have a solid chance of securing and are actively persuing:**

**Washington, DC**
**Shoshone Indian Tribe**
**Pequot Indian Tribe**
**Guam**
**Florida State Hospital Association**
**Several Large Florida Hospitals**
**City of Shreveport, Louisiana**
**City of Morgan City, Louisiana**
**Dominican Hospital System Louisiana**
**Baton Rouge General**
**Our Lady of the Lake Hospital, Louisiana**

8

**Ochsner Medical Center**
**State of Louisiana**
**25 Hospitals Underserved in Mississippi & Alabama (one entity owes all 25)**
**Dozens of additional Treatment Facilities**
The members of PLAST, LLC continue to aggressively pursue new opioid claimant.
These valuations are based upon governmental figures of damages suffered per person per year in each state and highly reliable industry studies.


Geographic_Variati
on_in_Cost_of_Opic


economic costs of
opioids.pdf


The Economic
Burden of Opioid Al


How the D.C.
region is responding


economic costs of
opioids.pdf


The
Underestimated Cos

**Valuation:**

## Overview

The Opioid Crisis is a commercially created pandemic which was completely preventable. Nationwide, the number of opioid prescriptions rose from 76 million in 1991 to 259 million in 2012. By 2015, the amount of opioids prescribed was enough for every American to be medicated around the clock for three weeks.

Statistics indicate that there is a ninety (90%) percent chance of becoming addicted after only 4days of continuing use of an Opioid derivative pain killer.

In 2018, 43% of Americans say the use of prescription pain drugs is a serious problem in their community.

Opioid prescriptions and overdoses have quadrupled since 1999. Americans consume more opioids than any other country. This has resulted in Eighty-Nine (89%) percent of all current heroin addicts in America addiction starting with a prescription to Opioid derivative pain killers.

The damages are assessed over the entire twenty-year time period the Opioid Derivative Pain Killers have been fraudulently marketed. Purdue Pharma in 2007 paid $600 million and admitted to downplaying the addiction risks of OxyContin, the company's flagship product.

Based on a Kaiser Foundation statement released April 5th of 2018, large employers alone spent a record $2.6 billion to treat opioid addiction and overdose in 2016, an eight-fold increase since 2004. The cost of an on-the-job injury is 9 times higher when a strong narcotic, such as Oxycontin, is used. The typical cost of a workplace injury is $13,000. The cost of a workplace injury when the employee has been prescribed a narcotic painkiller is $39,000.

Opioid overdoses accounted for more than 33,000 deaths in 2015 – more than any other period in U.S. history. Drug overdoses now kill more people than gun homicides and car crashes combined. This number has grown exponentially each years since 2015.

The societal costs of abuse (healthcare, criminal justice, and loss of work productivity) amounted to $55.7 billion in 2007 alone.

---

References:

Centers for Disease Control, https://www.cdc.gov/drugoverdose/data/statedeaths.html; The American Academy of Pain Medicine: *Societal Costs of Prescription Opioid Abuse, Dependence, and Misuse in the United States.* https://www.asam.org/docs/advocacy/societal-costs-of-prescription-opioid-abuse-dependence-and-misuse-in-the-united-states.pdf ; Joint Economic Committee Democrats. https://www.jec.senate.gov/public/_cache/files/6c604f91-3d90-4b0e-bdec-25780bfc9167/state-opioid-epidemic-fact-sheets.pdf; 2010 Analysis by Accident Fund Holdings.; Insurance Journal, June 20, 2018, *Opioid Makers Endure Setback,* by Jef Feeley.

## <u>Damages Sustained By States, Counties/Parishes and Municipalities</u>

The reimbursement of costs the governmental entities incurred to combat opioid abuse.  These "societal" costs include:

- Opioid-related hospitalization

- Drug education and rehabilitation

- Law Enforcement

- Court system and corrections

- Purchase and training in the use of Naloxone by First Responders

For example the addition of a single police officer due to increase in drug issues in a community can easily cost a small town $250,000.00 per year when you look at all the direct and indirect costs associated with the officer's employment to include, but not limited to, training, salary, vehicle, insurance, uniforms and supplies. It is easy to see that due to opioid crisis the increase of only 4 officers and the additional cost of incarceration can easily exceed the damage figures we used without any consideration for the costs of addiction services, loss of taxes, increases in insurance coverages, additional court personnel, additional jail cells, costs of treatment of addicted inmates, ect.

Also, the employees of these municipalities are not immune to suffering from Opioid Related issues. This results in the Governmental entity incurring damages for loss of productivity, increased health insurance costs (many of these governmental entities are self-insured.)  Many of the employees have jobs that they would be prevented from performing while under the influence of Opioids. This means the governmental entities loss 100% of the benefit of these employees' services as a result of Opioid related issues.

Law Enforcement can't work while on Opioids;
Bus Drivers can't drive while on Opioid;
Firemen can't work while on Opioids;
Street Crew worker can't work while on Opioids;

In short any employee required to drive, operate heavy machinery or work in close proximity to dangerous materials can't perform their duties while on Opioids. (See: *PDR for Hydrocodone*)

---

**References:**

**American Enterprise Institute,** *The geographic Variation in the Cost of the Opioid Crisis* **(March, 2018); and The United States Council of Economic Advisors, (November, 2017).**

These are the municipalities we currently have an interest in:

**TEXAS:**

In the State of Texas ever resident has experienced damages of $653.00 per year for the last 20 years as a direct result of the Opioid Crisis. These per resident cost of the opioid crisis were derived from two study conducted by the **American Enterprise Institute,** The geographic Variation in the Cost of the Opioid Crisis (March, 2018); and **The United States Council of Economic Advisors,** (November, 2017).

| City | Population | Per Capita Cost/Year | Total Damages |
|------|-----------|----------------------|---------------|
| Houston, TX | 2,303,000 | $653.00 | $30,077,180,000.00 |
| PLAST, LLC's interest in this claim: | | | $902,315,400.00 |

**MISSISSIPPI:**

In the State of Mississippi ever resident has experienced damages of $703.00 per year for the last 20 years as a direct result of the Opioid Crisis. These per resident cost of the opioid crisis were derived from two study conducted by the **American Enterprise Institute,** The geographic Variation in the Cost of the Opioid Crisis (March, 2018); and **The United States Council of Economic Advisors,** (November, 2017).

| City | Population | Per Capita Cost/Year | Total Damages |
|------|-----------|----------------------|---------------|
| Petal, MS | 10,704 | $703.00 | $150,498,240.00 |
| Purvis, MS | 2391 | $703.00 | $33,617,460.00 |
| Collins, MS | 2590 | $703.00 | $36,415,400.00 |
| Yazoo City, MS | 14,550 | $703.00 | $204,573,000.00 |
| Natchez, MS | 15,109 | $703.00 | $212,432,540.00 |
| Covington County, MS | 16,953 | $703.00 | $238,359,180.00 |

**The population of Covington County which is 19,543 was reduced by the population of its principal city Collin, Mississippi, which is listed above.**

**PLAST, LLC's interest in these claims:**               **$87,093,107.78**

**MISSOURI**:

In the State of Missouri ever resident has experienced damages of $1,727.00 per year for the last 20 years as a direct result of the Opioid Crisis. These per resident cost of the opioid crisis were derived from two study conducted by the **American Enterprise Institute,** The geographic Variation in the Cost of the Opioid Crisis (March, 2018); and **The United States Council of Economic Advisors**, (November, 2017).

| City | Population | Per Capita Cost/Year | Total Damages |
|------|------------|----------------------|---------------|
| Beverley Hills, MO | 597 | $1,727.00 | $20,620,380.00 |
| Cool Valley, MO | 1,175 | $1,727.00 | $40,584,500.00 |
| Northwoods, MO | 4,150 | $1,727.00 | $143,341,000.00 |
| Pagedale, MO | 3,292 | $1,727.00 | $113,705,680.00 |
| Pine Lawn, MO | 3,592 | $1,727.00 | $124,067,680.00 |
| Velda Village Hills, MO | 1,052 | $1,727.00 | $36,336,080.00 |
| Vinita Park, MO | 1,875 | $1,727.00 | $64,762,500.00 |
| Wellston, MO | 3,681 | $1,727.00 | $127,141,740.00 |
| Upland Park, MO | 443 | $1,727.00 | $15,301,220.00 |

**PLAST, LLC's interest in these claims:**                     $57,917,132.53

**PLAST, LLC's total interest in all Municipal Claims:**       $1,047,325,640.31

<u>**Medical Facilities' Damages Assessment**</u>

Hospitals and/or medical clinics have incurred and will continue to incur a variety of expenses related to the ongoing opioid epidemic. For example, Community Health Clinics treat numerous patients for the following opioid related conditions: (1) opioid overdose; (2) opioid addiction; (3) neonatal treatment for babies born opioid addicted because their mothers were opioid addicts, which is intensive, complex, and lengthy; and (4) psychiatric and related treatment for opioid users who are committed to mental health treatment programs.

Moreover, opioid users often present themselves to hospitals and clinics claiming to have illnesses and medical problems, which are pretexts for obtaining opioids to satisfy their cravings. As such, hospitals and clinics incur operational costs, consisting of expending time and incurring expenses, in diagnosing, testing and otherwise dealing with pill seekers, before their true status can be determined. Hospitals and clinics also incur operational costs in the form of surgical procedures that are more complex and expensive than would otherwise be the case if the patients were not opioid addicts, which complicates surgical procedures and requires special protective measures.

Opioid patients often do not have health insurance, Medicare or Medicaid coverage. The costs of their treatment are not reimbursed and are lost to hospitals and clinics. Even in cases where there is insurance, hospitals and clinics may still incur a partial loss.

4

According to one study, the cost of treating opioid overdose victims in hospital intensive care units jumped 58 percent in a seven-year span. The same study also showed that the average cost of care per opioid admission increased from $58,500 to $92,400.[1]

Hospitals can easily quantify their damages because of their price lists, which set the prices for a comprehensive listing of items billable to a hospital patient or the patient's health insurance providers.

<u>Example</u>

Publicly available data demonstrates how the opioid epidemic can impact a hospital. Here are some areas where the opioid epidemic has impacted hospitals:

- <u>Neo-natal ICU</u>: Neo-natal ICUs in the country with a capacity of 118 babies. Fifteen to twenty percent of the patients are opioid related. The neo-natal unit is consistently full. Opioid addicted babies can remain in the unit for 10 days or longer and are then transferred to a medical floor where they can remain for as long as two months. The cost for an admission of an opioid baby averages $66,000 while a non-opioid baby admission averages $3,500.

- <u>Addiction Services for pregnant women and Infant's Center</u>: Intervention program to identify and treat pregnant women.
- <u>Addiction Recovery Unit</u>: The hospital expanded this unit 60% in 2016 due to opioid admissions for a total of 16 beds. Most patients spend one month as inpatients and then two months as outpatients.

- <u>Emergency Room</u>: Hospitals have drug overdose admissions daily and on some days, multiple admissions. Many hospitals have instituted a program to provide Naloxone to overdose patients on discharge as well as a community program to distribute Naloxone. ER admissions would also include people suffering from drug withdrawal.

- <u>General Medical Hospital Admissions</u>: Complications related to opioid use such as IV infections of blood, heart infections, overdose, withdrawal, etc. Often very costly admissions.

- <u>Addiction Scholars Program</u>: Costs/opportunity costs for training two groups of 25 hospital staff over 15 months to deal with opioid related issues and provide guidance to hospital employees.

- <u>One-Stop Recovery Resource Center</u>: A collaborative of several agencies, where people can receive information, assessments and referrals for treatment.

---

https://khn.org/morning-breakout/the-cost-of-treating-an-opioid-overdose-92400/

- <u>Medicaid Reimbursement Differential</u>: For patients with Medicaid (see below), there is a possibility that a hospital could claim damages for the difference between the reasonable and customary charge for services that would be paid by insurance versus the lower Medicaid payments or the difference between actual costs versus what Medicaid paid.

Over a recent 10-year period, hospital inpatient treatment costs for opioid abuse increased from $4.57 billion to $14.85 billion and IV infection hospital inpatient treatment costs went from $190 million to $700 million. These costs do not include outpatient treatment following discharge.

Opioid related hospital admissions doubled between 2002 and 2012 and the average cost for inpatient opioid care per patient rose from $58,500 to $92,400 for 162 academic hospitals between 2009 and 2015.

Only 20% of opioid abuse patient admissions have private health insurance and only 14% of IV infection related patient admissions have private health insurance. This would indicate that hospitals have likely incurred substantial costs.

## Community Health Clinics:

All of the factors related to hospital damages associated with Opioid use are applicable to the Community Health Clinics. When you consider that these clinics are essentially health care of last resort and serve the underserved, a disproportionate number of which suffer from non-malignant chronic pain issues, Opioid addiction issues, mental health issues and general diminished health due to their respective socio-economic status. Therefore, it is easy to see how even a conservative evaluation of these clinics' damages will range from $500,000.00 to $1,000,000.00 annually for the last 20 years. We currently have an interest in 19 of these clinics. The physicians who own and operate these clinics, provide not just general healthcare, they also provide surgical services, obstetric services, mental health services ect. They are for all intents and purposes the only hospital and healthcare facilities available to the underserved. In the State of Mississippi, the clinics we have an interest in treat over 300,000 patents annually. That is approximately ten (10%) percent of the state's population. If the physicians who treat these underserved patients have to admit them into the hospital, they still incur loss as a result of having to continue to oversee the patient's treatment while hospitalized most times with no or at a substantially reduce payment.

Damages for all 19 clinics will range from $380,000,000.00 to $190,000,000.00 for purposes of evaluation we used a value for the damages suffered by all 19 of these clinics we used the average damage figure of:
**$285,000,000.00**

**PLAST, LLC's interest in these claims:**          **$24,066,666.70**

**Total damages suffered by all claimants based upon the factors set forth above:**

**$32,208,936,600.00**

## Calculation of Damage Valuation Contained in Offer to Sell

In order to be hyper conservative, we used for the purpose of settlement only six (6%) of their damages as quantified by the government studies cited above. If we take six (6%) percent of the damages sustained by the claimants' we currently have an interest in, these claims have a gross value of:

**$1,932,536,196.00**

**Value of the 1/6th interest after taking only six (6%) percent of their total value of the claims:**

**$35,787,707.33**

Therefore, since the Offer to Sale a 1/6th interest in **PLAST, LLC** for the price of **$6,500,000.00** was made, we have increase the value, taking only six (6%) of the actual damages, of the 1/6th interest by **$3,380,299.93** which represents 52% of the original purchase price.

The difference between this figure and the **$1,750,000,000.00** set forth in the offer to sale is due to our signing several new claimants subsequent to making the offer.

Additionally, we currently have verbal commitment with contracts outstanding awaiting signature to:

**Washington, DC**
**Shoshone Indian Tribe**
**Pequot Indian Tribe**; and
**Guam**
Using calculations on per capita damages sustained by these entities the damages for each are:

| Client | Population | Per Capita Cost/Year | Total Damages |
|---|---|---|---|
| DC | 693,971 | $3,657.00 | $50,735,096,940.00 |
| Shoshone (Utah) | 12,300 | $1,827.00 | $449,442,000.00 |
| Pequot (Connecticut) | 2,261 | $2,736.00 | $123,721,920.00 |
| Guam | 162,896 | $394.00 | $1,283,620,480.00 |

*There was no data in the studies concerning Guam so we used the smallest per capital damage of any state in the study, or $392.00/person/year.*

**The 1/6th interest after taking only six (6%) percent of the total value of these pending claims would be increased by an additional $29,217,711.90. This would bring the total value of a 1/6th interest to $65,005,419.23.**

These valuations are based upon governmental figures of damages suffered per person per year in each state. Washington, DC had the highest damages in the United States associated with the opioid crisis. We believe that the settlement value of these claims will be much higher than our ultra-conservative valuations. (See: **American Enterprise Institute**, *The geographic Variation in the Cost of the Opioid Crisis* (March, 2018); and **The United States Council of Economic Advisors**, (November, 2017).) Attached



Geographic_Variati
on_in_Cost_of_Opic



How the D.C.
region is responding



The
Underestimated Cos

**Valuation:**

## Overview

The Opioid Crisis is a commercially created pandemic which was completely preventable. Nationwide, the number of opioid prescriptions rose from 76 million in 1991 to 259 million in 2012. By 2015, the amount of opioids prescribed was enough for every American to be medicated around the clock for three weeks.

Statistics indicate that there is a ninety (90%) percent chance of becoming addicted after only 4days of continuing use of an Opioid derivative pain killer.

In 2018, 43% of Americans say the use of prescription pain drugs is a serious problem in their community.

Opioid prescriptions and overdoses have quadrupled since 1999. Americans consume more opioids than any other country. This has resulted in Eighty-Nine (89%) percent of all current heroin addicts in America addiction starting with a prescription to Opioid derivative pain killers.

The damages are assessed over the entire twenty-year time period the Opioid Derivative Pain Killers have been fraudulently marketed. Purdue Pharma in 2007 paid $600 million and admitted to downplaying the addiction risks of OxyContin, the company's flagship product.

Based on a Kaiser Foundation statement released April 5th of 2018, large employers alone spent a record $2.6 billion to treat opioid addiction and overdose in 2016, an eight-fold increase since 2004. The cost of an on-the-job injury is 9 times higher when a strong narcotic, such as Oxycontin, is used. The typical cost of a workplace injury is $13,000. The cost of a workplace injury when the employee has been prescribed a narcotic painkiller is $39,000.

Opioid overdoses accounted for more than 33,000 deaths in 2015 – more than any other period in U.S. history. Drug overdoses now kill more people than gun homicides and car crashes combined. This number has grown exponentially each years since 2015.

The societal costs of abuse (healthcare, criminal justice, and loss of work productivity) amounted to $55.7 billion in 2007 alone.

**References:**

 Centers for Disease Control, https://www.cdc.gov/drugoverdose/data/statedeaths.html; **The American Academy of Pain Medicine**: *Societal Costs of Prescription Opioid Abuse, Dependence, and Misuse in the United States.* https://www.asam.org/docs/advocacy/societal-costs-of-prescription-opioid-abuse-dependence-and-misuse-in-the-united-states.pdf ; **Joint Economic Committee Democrats**. https://www.jec.senate.gov/public/_cache/files/6c604f91-3d90-4b0e-bdec-25780bfc9167/state-opioid-epidemic-fact-sheets.pdf; **2010 Analysis by Accident Fund Holdings.; Insurance Journal, June 20, 2018,** *Opioid Makers Endure Setback,* **by Jef Feeley.**

### Damages Sustained By States, Counties/Parishes and Municipalities

The reimbursement of costs the governmental entities incurred to combat opioid abuse.  These "societal" costs include:

- Opioid-related hospitalization

- Drug education and rehabilitation

- Law Enforcement

- Court system and corrections

- Purchase and training in the use of Naloxone by First Responders

For example the addition of a single police officer due to increase in drug issues in a community can easily cost a small town $250,000.00 per year when you look at all the direct and indirect costs associated with the officer's employment to include, but not limited to, training, salary, vehicle, insurance, uniforms and supplies. It is easy to see that due to opioid crisis the increase of only 4 officers and the additional cost of incarceration can easily exceed the damage figures we used without any consideration for the costs of addiction services, loss of taxes, increases in insurance coverages, additional court personnel, additional jail cells, costs of treatment of addicted inmates, ect.

Also, the employees of these municipalities are not immune to suffering from Opioid Related issues. This results in the Governmental entity incurring damages for loss of productivity, increased health insurance costs (many of these governmental entities are self-insured.)  Many of the employees have jobs that they would be prevented from performing while under the influence of Opioids. This means the governmental entities loss 100% of the benefit of these employees' services as a result of Opioid related issues.

Law Enforcement can't work while on Opioids;
Bus Drivers can't drive while on Opioid;
Firemen can't work while on Opioids;
Street Crew worker can't work while on Opioids;

In short any employee required to drive, operate heavy machinery or work in close proximity to dangerous materials can't perform their duties while on Opioids. (See: *PDR for Hydrocodone*)

These are the municipalities we currently have an interest in:

### Large Metropolitan Areas Populations over 1,000,000:

**Houston, TX-** Fourth Largest City in America damages of approximately $250,000,000.00 annually or **$5,000,000,000.00** (per Beasley Allen).

2

**Small Cities:**

On average, based upon extremely conservative valuations and the factors set forth above, these communities have experienced damages of approximately $1,250,000.00 per year for the last 20 years.

| | |
|---|---|
| **Petal, MS** | **$25,000,000.00** |
| **Purvis, MS** | **$25,000,000.00** |
| **Collins, MS** | **$25,000,000.00** |
| | |
| **Subtotal:** | **$75,000,000.00** |

This city due to socio-economic and demographic factors and the factors set forth above has damages of approximately $1,500,000.00 annually.

| | |
|---|---|
| **Yazoo City, MS** | **$30,000,000.00** |

These communities due to socio-economic and demographic factors, their close proximity to Saint Louis, Missouri, and the factors set forth above, have damages of approximately $1,750,000.00 annually.

| | |
|---|---|
| **Beverley Hills, MO** | **$35,000,000.00** |
| **Cool Valley, MO** | **$35,000,000.00** |
| **Northwoods, MO** | **$35,000,000.00** |
| **Pagedale, MO** | **$35,000,000.00** |
| **Pine Lawn, MO** | **$35,000,000.00** |
| **Velda Village Hills, MO** | **$35,000,000.00** |
| **Vinita Park, MO** | **$35,000,000.00** |
| **Wellston, MO** | **$35,000,000.00** |
| **Upland Park, MO** | **$35,000,000.00** |
| | |
| **Subtotal:** | **$315,000,000.00** |

This mid-size city based upon the factors set forth above has annual damages of approximately $2,500,000.00.

| | |
|---|---|
| **Natchez, MS** | **$50,000,000.00** |

The County of Covington, MS has damages of approximately $2,500,000.00 annually.

| | |
|---|---|
| **Covington County, MS** | **$50,000,000.00** |

### Medical Facilities' Damages Assessment

Hospitals and/or medical clinics have incurred and will continue to incur a variety of expenses related to the ongoing opioid epidemic. For example, Community Health Clinics treat numerous

patients for the following opioid related conditions: (1) opioid overdose; (2) opioid addiction; (3) neonatal treatment for babies born opioid addicted because their mothers were opioid addicts, which is intensive, complex, and lengthy; and (4) psychiatric and related treatment for opioid users who are committed to mental health treatment programs.

Moreover, opioid users often present themselves to hospitals and clinics claiming to have illnesses and medical problems, which are pretexts for obtaining opioids to satisfy their cravings. As such, hospitals and clinics incur operational costs, consisting of expending time and incurring expenses, in diagnosing, testing and otherwise dealing with pill seekers, before their true status can be determined. Hospitals and clinics also incur operational costs in the form of surgical procedures that are more complex and expensive than would otherwise be the case if the patients were not opioid addicts, which complicates surgical procedures and requires special protective measures.

Opioid patients often do not have health insurance, Medicare or Medicaid coverage. The costs of their treatment are not reimbursed and are lost to hospitals and clinics. Even in cases where there is insurance, hospitals and clinics may still incur a partial loss.

According to one study, the cost of treating opioid overdose victims in hospital intensive care units jumped 58 percent in a seven-year span. The same study also showed that the average cost of care per opioid admission increased from $58,500 to $92,400.[1]

Hospitals can easily quantify their damages because of their price lists, which set the prices for a comprehensive listing of items billable to a hospital patient or the patient's health insurance providers.

<u>Example</u>

Publicly available data demonstrates how the opioid epidemic can impact a hospital. Here are some areas where the opioid epidemic has impacted hospitals:

- <u>Neo-natal ICU</u>: Neo-natal ICUs in the country with a capacity of 118 babies. Fifteen to twenty percent of the patients are opioid related. The neo-natal unit is consistently full. Opioid addicted babies can remain in the unit for 10 days or longer and are then transferred to a medical floor where they can remain for as long as two months. The cost for an admission of an opioid baby averages $66,000 while a non-opioid baby admission averages $3,500.

- <u>Addiction Services for pregnant women and Infant's Center</u>: Intervention program to identify and treat pregnant women.
- <u>Addiction Recovery Unit</u>: The hospital expanded this unit 60% in 2016 due to opioid admissions for a total of 16 beds. Most patients spend one month as inpatients and then two months as outpatients.

---

https://khn.org/morning-breakout/the-cost-of-treating-an-opioid-overdose-92400/

4

- <u>Emergency Room</u>: Hospitals have drug overdose admissions daily and on some days, multiple admissions. Many hospitals have instituted a program to provide Naloxone to overdose patients on discharge as well as a community program to distribute Naloxone. ER admissions would also include people suffering from drug withdrawal.

- <u>General Medical Hospital Admissions</u>: Complications related to opioid use such as IV infections of blood, heart infections, overdose, withdrawal, etc. Often very costly admissions.

- <u>Addiction Scholars Program</u>: Costs/opportunity costs for training two groups of 25 hospital staff over 15 months to deal with opioid related issues and provide guidance to hospital employees.

- <u>One-Stop Recovery Resource Center</u>: A collaborative of several agencies, where people can receive information, assessments and referrals for treatment.

- <u>Medicaid Reimbursement Differential</u>: For patients with Medicaid (see below), there is a possibility that a hospital could claim damages for the difference between the reasonable and customary charge for services that would be paid by insurance versus the lower Medicaid payments or the difference between actual costs versus what Medicaid paid.

Over a recent 10-year period, hospital inpatient treatment costs for opioid abuse increased from $4.57 billion to $14.85 billion and IV infection hospital inpatient treatment costs went from $190 million to $700 million. These costs do not include outpatient treatment following discharge.

Opioid related hospital admissions doubled between 2002 and 2012 and the average cost for inpatient opioid care per patient rose from $58,500 to $92,400 for 162 academic hospitals between 2009 and 2015.

Only 20% of opioid abuse patient admissions have private health insurance and only 14% of IV infection related patient admissions have private health insurance. This would indicate that hospitals have likely incurred substantial costs.

## **Community Health Clinics:**

All of the factors related to hospital damages associated with Opioid use are applicable to the Community Health Clinics. When you consider that these clinics are essentially health care of last resort and serve the underserved, a disproportionate number of which suffer from non-malignant chronic pain issues, Opioid addiction issues, mental health issues and general diminished health due to their respective socio-economic status. Therefore, it is easy to see how even a conservative evaluation of these clinics' damages will range from $500,000.00 to $1,000,000.00 annually for the last 20 years. We currently have an interest in 19 of these clinics. The physicians who own and operate these clinics, provide not just general healthcare, they also provide surgical services, obstetric services, mental health services ect. They are for all intents and purposes the only hospital and healthcare facilities available to the underserved. In the State of Mississippi, the clinics we have an interest in treat over 300,000 patents annually. That is approximately ten (10%) percent

of the state's population. If the physicians who treat these underserved patients have to admit them into the hospital, they still incur loss as a result of having to continue to oversee the patient's treatment while hospitalized most times with no or at a substantially reduce payment.

Damages for all 19 clinics will range from $380,000,000.00 to $190,000,000.00 for purposes of evaluation we used a value for the damages suffered by all 19 of these clinics we used the average damage figure of:

**$285,000,000.00**

Total damages suffered by all claimants based upon the factors set forth above and a conservative valuation is:

**$5,805,000,000.00**

**Calculation of Damage Valuation Contained in Offer to Sell**

In order to be hyper conservative in evaluating the settlement value of these claims, we used 1/3rd of the total damages of the claimants we had an interest in at the time the offer was made. If we take 1/3 of the damages sustained by the claimants' we currently have an interest in, these claims have a gross value of:

**$1,935,000,000.00**

Therefore, since the Offer to Sale a 1/6th interest in **PLAST, LLC** for the price of **$6,500,000.00** was made, we have increase the value of the 1/6th interest by **$3,425,925.92** which represents 53% of the original purchase price.

The difference between this figure and the **$1,750,000,000.00** set forth in the offer to sale is due to our signing several new claimants subsequent to making the offer.

Additionally, we currently have verbal commitment with contracts outstanding awaiting signature to:

**Washington, DC** (this claim will be worth in excess of **$1,000,000,000.00**);
**Shoshone Indian Tribe** (this claim should have a value of approximately **$1,750,000.00** per year for the last 20 years or **$35,000,000.00**);
**Pequot Indian Tribe** (this claim should be worth **$20,000,000.00**); and
**Guam** (this claim should have a value of approximately **$500,000,000.00**)

These valuations are based upon conservative values. We believe that the actual damages these communities and medical facilities have suffered could be three times our conservative valuation.